<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ipoint VENTURES, LLC, ROBERT BURKE & SCOTT STORNETTA, :<br><br>Plantiffs, :<br><br>v. :<br><br>PEQUOT CAPITAL MANAGEMENT, INC., :<br><br>Defendant. : | Civil Action No. 04-6026 (JAG)<br><br><u>OPINION</u> |

<u>**GREENAWAY, JR., U.S.D.J.**</u>

This matter comes before the Court on the motion of Defendant Pequot Capital Management, Inc. ("Pequot" or "Defendant") to dismiss, pursuant to F<small>ED</small>. R. C<small>IV</small>. P. 12(b)(2), for lack of personal jurisdiction. ipoint Ventures, LLC ("ipoint"), Robert Burke ("Burke"), and Scott Stornetta ("Stornetta" and collectively, "Plaintiffs") filed a cross-motion for limited discovery of Pequot's New Jersey operations in the event that the Court determined that it could not assert jurisdiction over Defendants based on the available evidence.[1]

For the reasons set forth below, this Court finds that it has personal jurisdiction over Defendant and, therefore, denies Defendant's motion to dismiss, pursuant to F<small>ED</small>. R. C<small>IV</small>. P. 12(b)(2), for lack of personal jurisdiction.

---

[1] This Court denies Defendant's motion to dismiss, pursuant to F<small>ED</small>. R. C<small>IV</small>. P. 12(b)(2). Therefore, Plaintiffs' cross-motion for limited discovery is denied as moot.

**PROCEDURAL HISTORY**

On October 20, 2004, ipoint filed a complaint against Peqout in the Superior Court of New Jersey, the State where Plaintiffs Burke and Stornetta reside and ipoint is incorporated. (Notice of Removal of Action, at 1.)  On December 8, 2004, Defendant Pequot, a private equity firm incorporated in Connecticut, removed the matter to the United States District Court for the District of New Jersey.  (Notice of Removal of Action, at 1.)  This Court has subject matter jurisdiction on the basis of diversity.  See 28 U.S.C. §§ 1332, 1446.

On December 28, 2004, Defendant filed the instant motion to dismiss, pursuant to FED. R. CIV. P. 12(b)(2), arguing that this Court lacks personal jurisdiction and must dismiss the action.  (Def.'s Br. at 14.)  On January 21, 2005, Plaintiffs responded to Defendant's motion to dismiss and filed a cross-motion for limited discovery of Pequot's New Jersey operations.  (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 23.)

**BACKGROUND**

New Jersey residents, Robert Burke and Scott Stornetta, founded ipoint Ventures, LLC, and incorporated ipoint in New Jersey on or about August 8, 2004.  (Compl. ¶ 1.)  ipoint maintained offices in Whippany, New Jersey.  (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 7.)  ipoint performs business consulting and analysis services.  Through these services, ipoint introduces venture capitalists to firms seeking infusions of capital.  (Ex. D to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, July Agreement, at 1.)

Pequot is a leading diversified alternative investment firm specializing in private equity and venture capital investments.  (Ex. A to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, at 1, www.pequotcap.com/.)  Pequot is a Connecticut corporation with offices in Connecticut, New

York, California, and Massachusetts.  (Ex. A to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, www.pequotcap.com/.)

**July Agreement**

Beginning in 2000, Burke and Stornetta conducted meetings with Pequot in their New York City offices to negotiate an arrangement, pursuant to which ipoint would identify for Defendant start-up and other incipient business prospects seeking capital investments.  (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 8.)  During the course of these discussions, Pequot directed a number of emails to the yahoo account of ipoint executive, Burke.  (Ex. E to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, emails between Pequot and ipoint dated June 9, 2000 to August 22, 2000.)  In addition, Pequot made phone calls to 973-644-0065, Burke's personal cell phone number.

In July 2000, ipoint and Pequot entered into a written agreement.  ("July Agreement.") The agreement formalized the relationship between the two parties whereby ipoint would introduce Pequot to representatives of Telecordia Technologies ("Telecordia"), Science Applications International Corporation ("SAIC"), and other respective affiliates for consideration of possible financial transactions.  (Ex. D to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, July Agreement, at ¶ 1.)  The July Agreement also contained a forum selection clause, pursuant to which Pequot consented "to the personal jurisdiction of the State and Federal Courts located in New Jersey and any action or proceeding arising from or relating to this Agreement [.]"  (Ex. D to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, July Agreement, at ¶ 8.)

**September 2000 Agreement**

In September 2000, the parties began to exchange drafts of a more definitive agreement ("September Agreement"). Plaintiffs concede that the September Agreement was "a kind of term sheet anticipating the parties' entry into a more formal Agreement." (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 9; Def.'s Br. at 9.) The parties continued negotiating the terms of the September Agreement exchanging various emails and telephone communications. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 9-10; Ex. G to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, emails between Pequot and ipoint dated August 31, 2000 to September 5, 2000.) The September Agreement anticipates an ongoing relationship between the parties in which ipoint would introduce Pequot to firms that presented strong investment opportunities. (Ex. G to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, emails between Pequot and ipoint dated August 31, 2000 to September 5, 2000.)

ipoint contends that the parties treated the September Agreement as a final agreement. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 10.) ipoint further asserts that Pequot financed two separate ventures that Defendant learned of as a result of ipoint's efforts. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 11-12.) Pequot infused a total of almost $18,700,000 into start-ups with New Jersey based contacts, Network Design Tools and Telelogue, Inc. of Iselin, New Jersey. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 11-12.) ipoint claims that there were also other New Jersey meetings between, Peqout, themselves, and companies seeking investors. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 11-12.) ipoint also points out that Pequot wired payments to its New Jersey bank account made pursuant to the agreement. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 13.)

**Other Dealings**

On August 17, 2000, Pequot met with representatives of Telecordia Technologies, a company based in Morristown, New Jersey at that time. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 8-9.) The meeting took place at Telecordia's office in Navesink, New Jersey. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 9.) ipoint alleges the purpose of the meeting was to develop the Telecordia/ Pequot relationship and explore the prospect of future investment deals between the parties relating to possible Telecordia spinoffs. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 9.)

ipoint also alleges that Pequot participated in a number of organizations and fora designed to develop business opportunities in New Jersey. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 4.) Some of these organizations include Jersey Angel Network, Young Startup Ventures, and the New Jersey Technology Council's 2002 NJTC Growth Company Showcase. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 5, www.jerseyangelnetwork.com/aboutjan.asp, www.youngstartup.com/events/?ysveid=54, www.njtc.org/events/gcs2002/agenda.html.)

**Defendant Contests Jurisdiction**

Defendant in this matter argues that Plaintiffs cannot establish specific jurisdiction. They contend that the September Agreement was not executed and Plaintiffs' allegations seek to assert specific jurisdiction for a breach of this agreement. (Def.'s Br. at 9.) Defendant also argues that even if the September Agreement were actionable, this agreement fails to establish the requisite minimum contacts with the forum state. (Def.'s Br. at 9.) Furthermore, Pequot contends that it would violate the notions of fair play and substantial justice to require it to defend itself in New Jersey. (Def.'s Br. at 11.) In addition, Pequot argues that Plaintiffs cannot establish general

jurisdiction because they did not have continuous and systematic contacts with New Jersey. (Def.'s Br. at 12.)

## **STANDARD**

A federal court sitting in diversity must conduct a two-step analysis to ascertain whether personal jurisdiction exists. First, the court must look to the forum state's long-arm statute to determine if personal jurisdiction is permitted over the defendant. Second, the court must determine whether the exercise of jurisdiction violates Due Process of the Fourteenth Amendment. See IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998); Vetrotex Certaineed Corp. v. Consolidated Fiber Glass Products Co., 75 F.3d 147, 150 (3d Cir. 1996). In this forum, the inquiry is collapsed into a single step, because New Jersey's long arm statute permits the exercise of personal jurisdiction to the fullest limits of due process, as defined under the Constitution of the United States. As such, federal law defines the parameters of this Court's in personam jurisdiction. See IMO Indus., Inc., 155 F.3d at 259.

The Fourteenth Amendment permits a state to exercise jurisdiction over an out-of-state defendant only where "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235 (1958)). It is the burden of the plaintiff to prove that the defendant has purposefully availed himself of the forum state. See Burke v. Ouartev, 969 F. Supp. 921, 924 (D.N.J. 1997). "[W]hen the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have

6

its allegation taken as true and all factual disputes drawn in its favor." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004) (quoting Burger King Corp., 471 U.S. at 477).

To prove that the defendant has purposefully availed itself of that state, a plaintiff may rely upon a defendant's specific contacts with the forum state. The burden to produce actual evidence of the defendant's contacts with the forum state rests on the plaintiffs. See Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 and n.9 (3d Cir. 1984). Personal jurisdiction, pursuant to such contacts, is known as specific jurisdiction. Specific jurisdiction is invoked when a claim is related to or arises of out the defendant's contacts with the forum. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984); Dollar Sav. Bank v. First Sec. Bank of Utah, 746 F.2d 208, 211 (3d Cir. 1984).

A court must first determine whether the defendant had the minimum contacts with the forum necessary for the defendant to have "reasonably anticipate[d] being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (citations omitted). What constitutes minimum contacts varies with the "quality and nature of defendant's activity." Hanson, 357 U.S. at 253. In assessing the sufficiency of minimum contacts for personal jurisdiction, the court must focus on the "relationship among the defendant, the forum, and the litigation." Keeton v. Hustler, 465 U.S. 770, 770 (1984). Otherwise stated, there must be at least "a single deliberate contact" with the forum state that relates to the cause of action. United States Golf Ass'n v. United States Amateur Golf Ass'n, 690 F.Supp. 317, 320 (D.N.J. 1988). The unilateral acts of the plaintiff, however, will not amount to minimum contacts. Helicopteros Nacionales de Colombia, 466 U.S. at 414; Hansen, 257 U.S. at 253.

Assuming minimum contacts have been established, a court may inquire whether "the assertion of personal jurisdiction would comport with 'fair play and substantial justice." Burger King Corporation v. Rudzewicz, 471 U.S. 462, 476 (1985) (quoting International Shoe Company v. Washington, 326 U.S. 310, 320 (1945)).  See also Pennzoil Prod. Co. v. Colelli & Assoc. Inc., 149 F.3d 197, 201 (3d Cir. 1998).  For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable to require the defendant to defend the suit in the forum state.  World-Wide Volkswagen. Corp. v. Woodson, 444 U.S. 286, 292 (1980).  To determine reasonableness, a court considers the following factors: the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering substantive social policies.  Id.  Only in "rare cases [do the] 'minimum requirements inherent in the concept of "fair play and substantial justice" . . . defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities.'"  Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County, 480 U.S. 102, 116 (1987).

If the plaintiff cannot establish specific jurisdiction, a court may exercise general jurisdiction over the defendant if the defendant has maintained "continuous and systematic" contacts with the forum state.  Helicopteros Nacionales de Colombia, 466 U.S. at 416.  To establish general jurisdiction the plaintiff "must show significantly more than mere minimum contacts" with the forum state.  Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987).  Moreover, the facts required to establish general jurisdiction must

be "extensive and persuasive." Reliance Steel Prods. v. Watson, Ess, Marshall, 675 F.2d 587, 589 (3d Cir. 1982).

A particular defendant may be dismissed from a lawsuit if the court cannot assert personal jurisdiction over the defendant, pursuant to this standard. See FED. R. CIV. P. 12(b)(2).

## **DISCUSSION**

Pequot, a Connecticut corporation, argues that it has not established sufficient contacts with the State of New Jersey to warrant the Court's exercise of personal jurisdiction. Defendant contends that the September Agreement cannot serve as a sufficient basis to establish specific jurisdiction over the Defendant because the agreement was not executed. Defendant also argues that the agreement itself does not arise out of or relate to Pequot's contacts with New Jersey. Further, Pequot contends that it would violate the notions of fair play and substantial justice to require the Defendant to defend itself in New Jersey. In addition, Pequot argues that Plaintiffs cannot establish general jurisdiction because it did not have continuous and systematic contacts with New Jersey.

This Court finds that it has in personam jurisdiction over Defendant because Defendant's contacts with New Jersey are sufficient to meet the minimum contacts requirement of the personal jurisdiction standard and the exercise of the Court's authority, in this instance, comports with the Due Process limits set forth in the 14th Amendment of the Constitution of the United States, specifically the notions of fair play and substantial justice. This Court further concludes that the Defendants have established continuous and systematic contacts with the forum state to warrant general jurisdiction.

**A. Specific Jurisdiction**

Defendant contends that the September Agreement is not actionable because the agreement was only a letter of intent and the parties never executed the contemplated agreement; therefore, it would be inappropriate for this court to assert specific jurisdiction over Defendant based on a breach of the September Agreement.

In contract law, it is a well established proposition that a bilateral agreement may be formed by an executed document reflecting a mutual exchange of promises for stated consideration or by specific performance. 17A Am. Jur. 2d Contracts, § 8 (2005); 1 Williston on Contracts § 1:17 (4th ed. 2004). Here, it appears, based on the evidence in the record, that the September Agreement was not merely the general term sheet Defendant contends that it is. While this Court need not determine whether the parties' activities constitute specific performance relating to the contract, this Court does conclude that a number of Pequot's actions reflect manifestations of assent to be bound by the terms of the draft agreement. Among the evidence reflecting the Defendant's assent is the Defendant's letter to Telecordia, (Ex. H to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, Pequot's Letter to ipoint dated November 1, 2000) as well as the wire transfer of money into the Plaintiffs' bank account. (Ex. I to Pls.' Br. Opp'n Def.'s Mot. to Dismiss.)

Plaintiffs Robert Burke and Scott Stornetta are carbon copied on the letter memorializing the sensitive information relating to the financing of Telecordia. The letter from Gerald Poch, Managing Director of Pequot, directed to the attention of Richard S. Wolf, VP of Advanced Network Systems of Telecordia Technologies, and Jane Cameron, Executive Director of Applied Research Venture programs, discusses issues that would seemingly not be shared with persons

unaffiliated with either business and having no relationship to the transaction.  In light of evidence like this, Defendant's arguments that there were no manifestations of ipoint and Pequot's commitment to terms of the September Agreement are disingenuous.  This is the type of information that is typically heavily guarded and protected by confidentiality provisions in agreements (see Ex. D to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, July Agreement, at ¶ 4), if not stand alone confidentiality agreements.  In addition, Defendant's wired payments sent after the September Agreement to ipoint's bank account warrants the inference by this Court that these funds represented payment for the services rendered with respect to the September Agreement. (Ex. I to Pls.' Br. Opp'n Def.'s Mot. to Dismiss.)

      Defendant also argues that the September Agreement as well as the negotiations surrounding it fail to establish minimum contacts with the State of New Jersey necessary to subject it to the specific jurisdiction of this Court. (Def.'s Br. at 9.)  Defendant focuses on the fact that all meetings related to the negotiated contract occurred in New York City. (Def.'s Br. at 9.)  Pequot also argues that the emails and phone calls surrounding the agreement, which where directed to a yahoo personal account and a personal cell phone of Burke, could be accessed anywhere and do not provide definitive proof that the Defendant had contact with the forum state. (Reply Br. in Supp. of Def. Mot. to Dismiss at 7.)  Defendant further contends that even if Plaintiffs had received the calls and emails in New Jersey these contacts do not establish that Pequot purposefully availed itself of the forum state. (Def.'s Br. at 10.)  This Court is not persuaded by Defendant's argument.

      The Supreme Court of the United States has made it clear that "mechanical tests" are not to be used when assessing personal jurisdiction.  Burger King Corp., 471 U.S. at 479.  This Court

must instead employ a "highly realistic approach." Id. Such an approach "recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. Id. (internal citations omitted). Logically then, the relevant factors include "prior negotiations," "contemplated future consequences," "the terms of the contract," and "the parties' actual course of dealing." Id.

Applying the "highly realistic approach," the September Agreement as well as the surrounding negotiations provide a sufficient basis for this Court to assert specific jurisdiction over Pequot. Minimum contacts can be established directly from this disputed agreement. There is uncontroverted evidence that: 1) in furtherance of efforts to build a business relationship, the parties were in communication for several months before the agreements were made; 2) Pequot sent substantial e-mail correspondence to ipoint, a resident of the forum; 3) Pequot made numerous calls to ipoint's telephone, which is registered to a New Jersey area code. Even though Burke's yahoo account and cell phone number could have been accessed from outside the forum, a reasonable inference can be made that a resident of a state is most likely to access these methods of communications within the forum state. While telephone calls and emails may not be dispositive on their own, they contribute towards determining if minimum contacts identified support jurisdiction in this matter. Remick v. Manfredy, 238 F.3d 238, 256 (3d Cir. 2001). Moreover, this Court recognizes that the September Agreement was simply "an intermediate step serving to tie up prior business negotiations[,]" some of which touched the forum state, "with the future consequences which themselves are the real object of the business transaction." Burger King Corp., 471 U.S. at 479.

In this case, the disputed agreement contemplated New Jersey-based investment opportunities in spinoffs from Telecordia, a New Jersey based business. (Ex. F to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, September Agreement, at 1.) As a result of the agreement, Defendants provided cash infusions to New Jersey based start-ups after an ipoint introduction. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 11.) This Court finds that the September Agreement as well as the negotiations leading up to the agreement provide the necessary minimum contacts for this Court to assert specific jurisdiction.

Defendant also advances the proposition that the July 2000 agreement and its surrounding contacts with New Jersey are irrelevant to the Court's specific jurisdiction analysis because this initial contract did not relate to the disputed September Agreement which serves as the basis of this action. Defendant cites Vetrotex Certaineed Corp. v. Consolidated Fiber Glass Products Co. for the proposition that courts conducting a specific jurisdiction analysis should contemplate "dealing *between the parties in regard to the disputed contract*, not dealings unrelated to the cause of action." 75 F.3d 147, 153 (3d Cir. 1996) (emphasis in original). Defendant argues that Vetrotex is analogous to the instant case. (Reply Br. in Supp. of Def. Mot. to Dismiss at 4.) As a result, Defendant contends that the Third Circuit's holding in Vetrotex controls and this matter should be dismissed.

This Court finds that the July Agreement and its surrounding contacts with New Jersey are part of the relevant totality of circumstances evidencing a previous course of dealing which should properly be taken into account. The instant case is distinguishable from Vetrotex on two significant and independent grounds. First, there is no long term hiatus between the agreements which tends to demonstrate a new relationship developing between the parties, separate and apart

13

from the prior relationship. Vetrotex, 75 F.3d at 149 n.2 ("Between May of 1989 and February of 1991, the record reveals no relationship between [the parties]. Indeed, the prior relationship between the parties had ended by 1989 and a new relationship began in 1991 . . . .") Second, Defendants in this matter have considerably more contacts with the forum state than the appellees in Vetrotex. Id. at 152. ("The only contacts that Conglas [the appellees] had with Pennsylvania consisted of some telephone calls and letters written to Vetrotex [the appellant] in Pennsylvania.")

In Vetrotex, a Pennsylvania corporation which had originally brought suit in the federal district court in Pennsylvania against a California corporation appealed the district court's dismissal of its complaint based on a lack of personal jurisdiction. Id. at 148. The Third Circuit affirmed the decision of the lower court. Id. The parties in Vetrotex negotiated two separate contracts which involved the plaintiff's sale of goods to the defendant. Id. at 153. The court found that a prior contract, which the plaintiff had terminated two years earlier, as well as the negotiations surrounding this contract, were irrelevant to the question of specific contacts regarding the disputed contracts. Id.

The court in Vetrotex makes it clear that in determining whether specific jurisdiction exists in contract cases a federal district court should consider not only the contract "but also 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" Id. at 151 (quoting Burger King, 471 U.S. at 479). In Vetrotex, the court even determined that a previous supply agreement, which was not mentioned in the complaint and was superseded by a later agreement, qualified as a relevant prior negotiation. Id. at 151 n.4.

Here, the July Agreement is not a preliminary agreement. It appears that it was an executed agreement between the parties reflecting the agreement for each to engage in certain activities as to a specified transaction. The September Agreement appears to be intended to supersede the earlier contract between the parties. The July Agreement and the prior negotiations surrounding it provide strong evidence of the parties' actual course of dealing. The original agreement provides context for the finder of fact in determining the nature of the parties' relationship. Both the July and September Agreements indicate that ipoint provided business consulting, analysis services and arranged meetings between management officials at Pequot, and high-ranking representatives of Telcordia and other businesses that presented investment opportunities. (Ex. D to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, July Agreement, at 1; Ex. F to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, September Agreement, at 1.) The September Agreement indicates that ipoint was responsible for introducing Pequot to the most senior leaders in Telecordia and advising them of a possible deal with SAIC. (Ex. F to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, September Agreement, at 1.) The parties' initial agreement helped to facilitate and to provide the underpinning on which the September Agreement was built. The two agreements were part and parcel of a similar action designed to provide Peqout with an opportunity to fund start-up ventures. The July Agreement qualifies as a relevant prior negotiation under Burger King and Vetrotex.

This case also differs from Verotex in another important regard. Defendants in this matter have considerably more contacts with the forum state than the defendants in Vetrotex. The court in Vetrotex makes it clear that a defendant who is merely a passive buyer of a product does not purposefully avail itself of the privilege of doing business in the forum state. 75 F.3d at

152. The Third Circuit also carefully distinguishes between the instance in which a defendant acts as merely a passive buyer from a situation in which a defendant initiated a business relationship leading up to the contract or "engaged in extensive post-sales contacts with the plaintiff in the forum state." Id. at 152-53.

Defendants in this case were not passive buyers purchasing a product from another state where the foreign state's status played no role in the formation of the contract. The disputed agreement itself evidenced that Defendants were interested in further exploring a relationship with a New Jersey based company, Telecordia, and possibly starting other spinoff companies. (Ex. F to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, September Agreement, at 1.) As mentioned earlier, Defendants also provided cash infusions to New Jersey based start-ups after an ipoint introduction. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 11.) Pequot was certainly more than a passive buyer of a product and the disputed agreements evidence an attempt to purposefully avail itself of the privilege of conducting business in New Jersey. Furthermore, the July and September Agreements as well as the telephone calls and emails leading up to and following the first agreement evidence that Pequot may have initiated a business relationship with ipoint from which this dispute stems. These correspondence were clearly not unilateral activities taken by Plaintiffs. In addition, as this Court has noted above, the July Agreement is a relevant prior negotiation. So even though the forum selection clause that Pequot signed is not binding on the parties, it does provide some indication that Defendant certainly contemplated that the course of business that it was pursuing might subject it to the jurisdiction of the State of New Jersey. This evidence taken collectively provides a sufficient basis for this Court to find that minimum contact requirements have been met in this instance.

Defendant also argues that asserting specific jurisdiction over it in this circumstance would not comport with the notions of fair play and substantial justice because it "is not a New Jersey Corporation and should not be forced into a New Jersey forum merely by the plaintiffs' preference." (Def.'s Br. at 11.)

For personal jurisdiction to comport with "fair play and substantial justice," it must be reasonable to require the defendant to defend the suit in the forum state. World-Wide Volkswagen. Corp., 444 U.S. at 292. As the Supreme Court makes clear in Asahi Metal Indus. Co., Ltd., only in "rare cases [do the] 'minimum requirements inherent in the concept of "fair play and substantial justice" . . . defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities.'" 480 U.S. at 116.

This Court finds that extending jurisdiction over Pequot comports with the notions of fair play and substantial justice. Pequot is a Connecticut based company with offices in New York City which has conducted business in New Jersey directly resulting from the disputed agreement. The inconvenience which Pequot would suffer as a result of litigating the matter in New Jersey is not so substantial as to render an assertion by this Court of jurisdiction as unconstitutional. The quality and nature of the interstate transaction was not so random, fortuitous or attenuated that Defendants could fairly be said not to have reasonably anticipated being haled into court in the State of New Jersey. See World-Wide Volkswagen Corp., 444 U.S. at 297. This is not a rare instance where extending jurisdiction over a non-resident defendant, which has engaged purposefully in forum activities, would violate the notions of fair play and substantial justice rendering the exercise unconstitutional. Asahi Metal Indus. Co., Ltd., 480 U.S. at 116.

17

Therefore, this Court finds that it has specific jurisdiction over Pequot, as Pequot purposefully availed itself of the benefits and privileges of doing business in New Jersey with ipoint and is creating business with residents of the forum, and these interactions create sufficient contacts with New Jersey to make jurisdiction reasonable and in line with "traditional notions of fair play and substantial justice." International Shoe Co., 326 U.S. at 310.

**B.  General Jurisdiction**

Pequot claims that there is insufficient evidence to establish that it has had the requisite continuous and systematic contacts with the forum state.[2] In support of this position, Pequot maintains that the company has no offices, employees, agents, or real property in New Jersey. (Davis Affidavit ¶¶ 3, 6.)  Pequot contends that it is not licensed to do business in New Jersey. (Davis Affidavit ¶ 4.)

To establish general jurisdiction the plaintiff "must show significantly more than mere minimum contacts" with the forum state. Provident Nat'l Bank, 819 F.2d at 437.  Moreover, the facts required to establish general jurisdiction must be "extensive and persuasive." Reliance Steel Prods., 675 F.2d at 589.  Accordingly, a court may exercise general jurisdiction over the defendant only if the defendant has maintained "continuous and systematic" contacts with the forum state.  Helicopteros Nacionales de Colombia, 466 U.S. at 416.

In the matter sub judice, Pequot's activities, taken with the respect to the State of New Jersey, are so extensive and pervasive as to render Defendant subject to the general jurisdiction

---

[2] Although this Court finds that it has specific jurisdiction, in response to Pequot's argument that this Court lacks specific and general jurisdiction, in the face of uncontested evidence that Pequot is an active and aggressive business in the New Jersey private equity and venture capital arena, this Court shall address Pequot's claim tersely.

of this Court for any cause of action. Pequot belongs to several trade organizations, which target New Jersey businesses. (Pls.' Br. Opp'n Def.'s Mot. to Dismiss at 4.) Notably, Pequot's agents serve as speakers and panelists at conferences within the forum, the purpose of which is to discuss venture capital investment in New Jersey. (Ex. C to Pls.' Br. Opp'n Def.'s Mot. to Dismiss.) Pequot has allowed its agents to be described at these conferences as among "the region's leading venture capitalists who have committed to making investments in the New Jersey market." (Ex. C to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, at 1, www.njtc.org/events/gcs2002/agenda.html.) At one conference, the program states that the speakers, which included Martin Hale, Pequot's Senior Vice President, would discuss "why [they] view New Jersey as fertile ground for opportunities and continue to invest in New Jersey's technology companies despite [] turbulent financial and economic downturns." (Ex. C. to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, at 1, www.njtc.org/events/gcs2002/agenda.html.) In addition, Pequot has aggressively pursued the opportunity to secure introductions to representatives from New Jersey-based businesses that would create strong investment opportunities. The July and September Agreements establish that Defendant was generally conducting business in New Jersey and actively seeking future business opportunities in the State. (Ex. D to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, July Agreement, at 1; Ex. F to Pls.' Br. Opp'n Def.'s Mot. to Dismiss, September Agreement, at 1.) There is sufficient evidence to warrant a determination that these particular agreements were part of a concerted general effort by Pequot to garner more New Jersey investment opportunities.

It appears that these contacts, which include investments in the forum, speaking at conferences in the forum and taking specific actions in the forum geared at encouraging further

investment here, all amount to "continuous and systematic" activities in New Jersey. Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 445 (1952). Furthermore, these actions demonstrate purposeful availment of the "privileges of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson, 357 U.S. at 253. Given that this Court finds that Peqout "purposefully directed" its efforts toward residents of New Jersey, this Court rejects Peqout's argument that "an absence of physical contacts can defeat personal jurisdiction" here. Burger King, 471 U.S. at 476 (citing Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774-775 (1984)). Therefore, this Court concludes it also has general in personam jurisdiction.

## CONCLUSION

For the foregoing reasons, this Court finds that Plaintiffs have established that minimum contacts exist arising from the disputed agreement to warrant the assertion of general and specific jurisdiction over the Defendants.

 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Dated: July 27, 2005